Lloyd W. **HARTMAN** and Robert W. Clifford, for themselves and certain other owners of shares of stock of Lake Central Airlines, Inc. similarly situated, Plaintiffs,

v.

**NORTH CENTRAL AIRLINES, Inc.,**
Defendant.

**No. IP 55-C-144.**

United States District Court
S. D. Indiana, Indianapolis Division.

Sept. 20, 1956.

Buschmann, Krieg, DeVault & Alexander, Indianapolis, Ind., Albert F. Grisard, Washington, D. C., for plaintiffs.

Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., Fairchild, Foley & Sammond, Milwaukee, Wis., for defendant.

STECKLER, Chief Judge.

The above entitled cause came on regularly for trial and the court having duly considered the evidence, the post-trial briefs filed by the parties, having heard the oral arguments of counsel in support thereof and in regard to the proposed findings of fact and conclusions of law, and being otherwise fully advised in the premises now makes the following findings of fact and conclusions of law:

## The Issues

This is an action for declaratory judgment brought by the plaintiffs as repre-

888

sentatives of a class composed of themselves and certain other owners of shares of stock of Lake Central Airlines, Inc. Plaintiffs seek to have this court render a declaratory judgment defining the rights of the plaintiffs in respect to the shares of stock which they now own and which they acquired on January 31, 1955, subject to the defendant's rights, if any, to purchase said stock, under a contract executed October 17, 1952, between the defendant and certain members and family corporations of the Roscoe P. Weesner family, who were the plaintiffs' predecessors in interest of the controlling stock of Lake Central Airlines, Inc. Plaintiffs ask the court to declare the stock purchase contract of October 17, 1952, materially breached by North Central Airlines, Inc. and that the plaintiffs be excused from performance thereunder.

The theory of the plaintiffs' case is two-fold: (1) North Central breached the contract by applying for Lake Central's Route No. 88 on March 25, 1953, which breach was not waived by plaintiffs or their predecessors (the Weesner family and their family controlled corporations), and that such breach was material; (2) North Central breached the contract by requesting and obtaining delays in three scheduled hearing dates of Civil Aeronautics Board Docket No. 5770, thus preventing a decision by the Civil Aeronautics Board from being reached and the purchase price from being paid within the time contemplated by the parties, which breach was material.

The defendant's theory of defense, on the other hand, is that it has not breached the contract in any respect, and that if any of its actions should be held to be breaches, any such breach is not so material as to excuse performance of the contract and that such breaches, if any, were waived; that the contract is a fully binding and enforceable obligation on itself and plaintiffs as the Weesner group's successors in interest.

As a subsidiary point, the defendant further asks the court to declare it to be entitled to specific performance of the contract between it and the Weesner group on receipt of the necessary Civil Aeronautics Board approval for its performance.

For the sake of brevity, hereinafter North Central Airlines, Inc. will be referred to as North Central; Lake Central Airlines, Inc., Lake Central; Civil Aeronautics Board, C. A. B.; the Roscoe P. Weesner family and the Weesner family controlled corporations, the Weesners or Lake Central Majority Stockholders; the Civil Aeronautics Act of 1938, as amended, 49 U.S.C.A. § 401 et seq., will be referred to as the Act; the contract of October 17, 1952, the Contract; Ozark Airlines, Inc., Ozark; Transport Airgroup, Inc., Transport; and Allegheny Airlines, Inc., will be referred to as Allegheny.

### Findings of Fact

1. Plaintiffs Lloyd W. Hartman and Robert W. Clifford are citizens and residents of the State of Indiana and the plaintiffs represented and included in the class for which this action is brought are citizens and residents of other states, including the District of Columbia, except the State of Wisconsin. Defendant is a Wisconsin corporation. The matter in controversy, exclusive of interest and costs, exceeds the sum of $3,000.

2. The named plaintiffs are beneficial owners of 5,000 shares of common capital stock of Lake Central, and the 169 plaintiffs included in the class for which this action is brought are beneficial owners in varying amounts of a total of 75,954 shares of such stock. The named plaintiffs and such other plaintiffs are similarly situated and it is impractical to bring all the members of the class before this court.

3. The 80,954 shares of common capital stock of Lake Central now held beneficially by plaintiffs were acquired January 31, 1955, subject to the rights, if any, of defendant under the Contract executed October 17, 1952, between defendant under its then corporate name, "Wisconsin Central Airlines, Inc.," and Frontier Airmotive, Inc., Nationwide Airlines, Inc., John V. Weesner and W. W. Weesner for the purchase by defendant of 80,054

shares of the common capital stock of Lake Central, such 80,054 shares being part of the shares so acquired by plaintiffs. The Contract was received in evidence as Item 4 of the Stipulation of Facts and is incorporated herein by reference.

4. Plaintiffs have asserted and defendant has denied that defendant has committed material breaches of the Contract excusing performance thereof by plaintiffs, and as a result an actual controversy exists between plaintiffs and defendant as to the validity and enforceability of the Contract.

5. The Contract was conditioned upon the approval by the C.A.B. of the stock acquisition. By the terms of the Contract of October 17, 1952, the sellers were to transfer to the buyer all of their shares of stock in Lake Central as identified in the Contract within five days after all necessary approvals of C.A.B. had been obtained (Paragraph 8 of the Contract). The buyer, North Central, was to pay the purchase price in full and in cash within thirty days after the happening of a second condition, i. e., the settlement by Lake Central of its claim with the United States Government in its initial permanent mail rate determination case (Paragraph 3 of the Contract). The purchase price was to be equivalent to the net book value of Lake Central as of the "cut off date of and including the award in the initial permanent mail rate settlement plus $10,000.00" (Paragraph 2 of the Contract).

By Paragraph 4 of the Contract it was provided that if the net book value of Lake Central Airlines, Inc. as of the cut off date and including the award in the initial permanent mail rate settlement, including losses arising out of a crash of a Beechcraft Bonanze airplane on August 21, 1952, plus $10,000, is negative, at the option of the buyer, the buyer may, within sixty days, perform, sell, assign, transfer or void the Contract.

6. The contracting parties contemplated that a decision by the C.A.B. in the Lake Central Stock Acquisition Case (which, when the application was filed before the C.A.B. was assigned Docket No. 5770) would take from six to eighteen months and would precede a determination in the Lake Central Permanent Mail Rate Case. That such was their contemplation is well supported by the record. A. L. Wheeler, General Counsel and Member of the Board of North Central, testified that the contracting parties "thought" that the C.A.B. decision in Docket No. 5770 would precede a determination in the Lake Central permanent mail rate case. Transcript, pages 83, 87. In substance, the same testimony was given by Lloyd Hartman, Executive Vice President of Lake Central, who attended the contract negotiation meetings. The Contract, when read as a whole, implicitly discloses that such was the contemplation of the parties.

That the contemplation of the parties was reasonable is also well supported by the record. The C.A.B., in an interim opinion dated October 17, 1952 (the same date of the Contract here involved), in the Indiana-Ohio Local Service Case, Docket No. 4034, referred to in the Contract, made reference to the contemplated length of time it would take to process Docket No. 5770, when it said: "Such a proceeding is likely to take from 6 to 18 months, especially if more than one buyer should evidence an intention to reach an agreement with Lake Central's management on reasonable terms for acquisition of such control." Stipulation Item 9. Also, Mr. Oswald Ryan, who was for many years a member of the C.A.B. and during several periods served as its chairman, testified that the C.A.B. policy was to give procedural priority to merger or acquisition cases. In a study he made of twenty-seven major cases involving mergers or acquisitions before the C.A.B., he found the average length of time between the filing of the initial application and a final decision by the C.A.B. to be less than eleven months. Transcript, page 206. The longest case of those involving domestic airlines took nineteen months, and the shortest, two and one-half months.

7. At all times herein pertinent, both Lake Central and defendant have been local service air carriers subject to regulation by the C.A.B. under the provisions of the Act. Lake Central has held, except as otherwise noted, a certificate of public convenience and necessity, issued by the C.A.B., to engage in air transportation of persons, property and mail over Route No. 88, and defendant has held a similar certificate to Route No. 86. Lake Central's Route No. 88 consists of air routes between various cities in Indiana, Ohio, Illinois, Michigan and Pennsylvania. North Central's Route No. 86 consists of air routes between various cities in Wisconsin, Minnesota, Michigan, Illinois and Indiana.

8. In 1952, members of the Roscoe P. Weesner family, individually and through their family owned corporations, Frontier Airmotive, Inc., and Nationwide Airlines, Inc., owned substantially all of the common capital stock of Lake Central and members of the Weesner family managed Lake Central. Lake Central's certificate to Route No. 88 had expired, and a C.A.B. investigation was pending to consider a renewal and extension of the routes, Lake Central operating meanwhile under § 9 (b) of the Administrative Procedure Act, 5 U.S.C.A. § 1008(b). A C.A.B. hearing examiner, in the Indiana-Ohio Local Service Case, Docket No. 4034, et al., a proceeding involving the question of whether Lake Central's temporary certificate should be renewed, found that the then existing management and controlling stockholders of Lake Central had violated various provisions of the Act and Board regulations, and recommended that the Board find that the carrier was not fit, willing and able within the meaning of Section 401 of the Act to continue the operation of Route 88. The examiner also expressed doubts as to Lake Central's financial ability to operate the routes it had applied for. It was a prerequisite to the right of Lake Central to continue the operation of Route 88 that the C.A.B. find that it was fit, willing and able to engage in air transportation. Such a finding was a required condition for the issuance of any certificate under the Act, 49 U.S.C.A. § 481(d).

The C.A.B. examiner's hearing was held in July, 1952, and the examiner issued a report in which he stated the Weesners were unfit to continue in the aviation business, following which he made his recommendation that Lake Central not be granted a certificate to operate Route 88 because of the unfitness of the Weesner management.

9. Exceptions were taken to the examiner's report and oral argument to the C.A.B. itself was set for September 18, 1952. The Weesner family recognized the likelihood of the refusal of C.A.B. to renew the certificate of Lake Central for Route 88 while under their management. Therefore they set about to sell their controlling stock in Lake Central in order that they could announce at least a sale contract at the oral argument on September 18, and set it up as a means of divesting themselves of active control and management of Lake Central, thereby making it possible for the C.A.B. to renew the Route 88 certificate for Lake Central, the corporate entity.

On September 17, 1952, North Central (then Wisconsin Central Airlines, Inc.) and the Majority Stockholders of Lake Central, the Weesner family and two of the airlines they controlled, Frontier Airmotive, Inc. and Nationwide Airlines, Inc., entered into a contract wherein North Central agreed to purchase all of the Weesners' 80,054 shares of the common stock in Lake Central.

10. Said contract of September 17 was not thereafter ratified by the directors of the Weesner family corporations, and on October 17, 1952, some revisions were agreed upon and the Contract was drafted, executed and ratified by all corporate parties thereto at a meeting in Madison, Wisconsin. At both negotiating sessions, the Weesner family had the assistance of counsel, and the Contract was drafted by the joint work of Weesner counsel and defendant's counsel.

11. Since the Contract involved the acquisition of control of one air carrier, Lake Central, by another, defendant, it

was necessary under the Act that the Contract and such acquisition of control be approved by the C.A.B., and on October 1, 1952, defendant filed an application with the C.A.B. in Docket No. 5770 for such approval, which was subsequently amended on November 3, 1952. Stipulation Item 7.

12. On the same day the Contract was executed and ratified in Madison, Wisconsin (October 17, 1952), the C.A.B. in Washington issued an interim decision in the Lake Central certificate proceeding, and stated that on the basis of the examiner's report regarding the Weesner management of Lake Central and of the record, it was unable to make the required finding that Lake Central was presently fit, willing and able to operate as an air carrier under the Act. The C.A.B. took notice of defendant's application in Docket No. 5770, however, for approval of an agreement which, if executed, would merge Lake Central with defendant, and stated such merger would provide the basis for the required statutory finding. It therefore suggested that during the interim period while Docket No. 5770 was being processed, if the Weesners would work out a voting trust to provide a substitute interim management of Lake Central or some comparable arrangement for permanent divestiture of Weesner control, the question of Lake Central's fitness could be resolved for the interim period. Stipulation Item 9.

13. The Weesners thereafter worked out a voting trust arrangement, and on December 30, 1952, the C.A.B. approved that arrangement.

14. After defendant filed its application in C.A.B. Docket No. 5770 for approval of the Contract, Ozark, an operating air carrier, and Transport, a newly-formed air carrier corporation, each filed with the C.A.B. an application for an original certificate to Lake Central's Route No. 88 and a motion to intervene in Docket No. 5770.

15. Ozark's application for Lake Central's Route No. 88 and its motion to intervene in Docket No. 5770 was filed with the C.A.B. on November 13, 1952. On December 8, 1952, Lake Central, through its counsel, Albert F. Grisard, filed its petition for leave to intervene in Docket No. 5770, stating that it had a substantial interest in the subject matter of the Lake Central controlling stock acquisition proceedings and that the Contract entered into by North Central and the owners of the controlling stock interest in Lake Central did not include Lake Central, the corporation, as a party to the Contract. Transport, on March 19, 1953, filed in Docket No. 6091 its petition for leave to intervene in the stock acquisition proceeding, Docket No. 5770, and for permission to be considered as a potential transferee of the controlling stock interest in Lake Central, should the C.A.B. disapprove North Central's acquisition as not being in the public interest. Ozark's application to intervene stated that it would offer the C.A.B. an alternative to North Central's acquisition of the stock.

16. A pre-hearing conference in Docket No. 5770 held on March 19, 1953, was attended by W. W. Weesner, as a representative of the Weesner group, by counsel for defendant, Lake Central, Ozark, Transport and others. Ozark and Transport suggested the consolidation of their respective certificate applications with Docket No. 5770, and the bureau counsel indicated he would suggest that a broad investigation be instituted and consolidated with Docket No. 5770 to have all such issues heard together.

Defendant opposed the consolidation and, according to testimony of its counsel, first took the position, which is now urged in defense, that it would be forced to file an application for a certificate to Route 88 as a protective measure. The report of the hearing examiner, made subsequent to the conference and served on March 23, 1953, recognized the defendant's characterization of its action. The record does not satisfactorily disclose what position, if any, was taken by W. W. Weesner at the prehearing conference with respect to the other applications for Lake Central's routes under Section 401 of the Act.

Whether the defendant's filing was merely protective is, of course, a question of fact, and plaintiffs argue strenuously that it was not merely protective in nature. It was, they point out, in no way conditioned upon the C.A.B.'s approval or disapproval, nor upon the consolidation of the other route applications with Docket No. 5770, and plaintiffs urge it was filed in violation of Paragraph 19 of the Contract.

17. After the examiner's report there followed a series of pleadings and motions in the respective dockets pertaining to Route 88.

18. On March 25, 1953, defendant filed an unconditional application in C.A. B. Docket No. 6043 for a certificate to Route 88 and requested consolidation with Docket No. 5770.

19. On April 6, 1953, Transport filed with the C.A.B. in Docket No. 5770 a verified petition praying that the C.A.B. (1) grant its petition for leave to intervene in Docket No. 5770 and be considered a potential transferee of the controlling stock interest of Lake Central should North Central's application be denied; (2) in the alternative, grant its application for an original certificate of the Lake Central routes if a purchase of the controlling stock of Lake Central could not be arranged on terms meeting approval of the C.A.B., and (3) to consolidate with No. 5770 for joint hearing Docket No. 5826, Ozark's application for a certificate to serve the routes operated by Lake Central, Docket No. 6025, Transport's application for a certificate to serve the routes operated by Lake Central, and Docket No. 6043, North Central's application for a certificate to serve the routes operated by Lake Central. Stipulation Item 30.

20. On April 7, 1953, Ozark filed with C.A.B. in Docket No. 5770 its motion to consolidate with said docket for hearing its application in Docket No. 5826 for Route No. 88, as amended, and its petition in Docket No. 6066 for revocation of Lake Central's certificate for Route No. 88. Stipulation Sec. 31.

21. On April 7, 1953, Ozark filed with C.A.B. in Docket No. 6068 an application for approval of the acquisition of control of Lake Central. Stipulation Item 18.

22. On April 14, 1953, North Central filed its "Opposition to Motions for Consolidation" in which it asserted its opposition to all the certificate applications, even including its own, and to the various motions for consolidation. Stipulation No. 19. In its opposition North Central set forth that its application was "intended to be protective in nature" and that all such applications, in view of Lake Central's existing authority to serve the route, were "premature and should not be heard at this time, much less consolidated with Docket No. 5770."

This statement of its own position preceded the dispute over the effect of its action in filing for Lake Central's Route 88, for it was prepared seven days prior to the filing of Lake Central Majority Stockholders' "Answer and Opposition Of The Majority Stockholders To The Reply of Transport Airgroup, Inc." where the issue of possible breach was first raised. Though this shows timely action by the Lake Central Majority Stockholders in raising the question, the fact that it followed Lake Central's statement of its position is relevant on the question of whether North Central's action was merely protective.

23. Lake Central management through its Reply and Opposition to the various petitions and motions of Ozark, North Central and Transport, filed on April 13, 1953, took no position on the consolidation in Docket No. 5770 of any application which sought approval of the acquisition of control of Lake Central by the purchase of the stock of Lake Central. However, Lake Central management strongly opposed any effort to inject into the acquisition proceedings any application or petition which had as its purpose the revocation, or suspension, of Lake Central's temporary certificate for Route No. 88. Lake Central management asked the C.A.B. to enter an order (1) dismissing the petition or application to

suspend or revoke the certificate for Route 88 filed by Ozark in Docket No. 6066, (2) denying or dismissing the motions and petitions of Ozark, North Central and Airgroup, Inc. for consolidation of their dockets, Nos. 5826, 6043 and 6025, respectively, with Docket No. 5770, for hearing and decision, (3) confining the scope of Docket No. 5770 proceedings to the issue of acquisition of control of Lake Central, and for such other relief as to the Board may appear appropriate.

24. On April 21, 1953, Charles S. Murphy, an attorney employed by the Lake Central Majority Stockholders, filed his appearance in Docket Nos. 5770, 5826, 6025, 6043 and 6066.

25. On April 21, 1953, the Lake Central Majority Stockholders filed their written Answer and Opposition to the reply of Transport. In it, the Lake Central Majority Stockholders fully supported Lake Central management's opposition to consolidating into the acquisition proceedings in Docket No. 5770 any petition for the suspension or revocation of the certificate of public convenience and necessity held by Lake Central or any application by another carrier for a certificate to Route No. 88. The Majority Stockholders pointed out that the consolidation of any such petition or application into the acquisition case would substantially broaden the issues and would impose upon Lake Central and the Majority Stockholders an unjustifiable burden and expense. The Majority Stockholders further took the position that any applications under Section 401 of the Act for the purpose of having the Board consider the suspension or revocation of Lake Central's certificate were out of order, particularly in view of the fact that only four months previously the Board had issued a temporary certificate to Lake Central to operate Route 88. The Majority Stockholders further advised the Board that Lake Central had already inaugurated service to all but one of its segments, which it was required to serve, after having purchased three additional aircraft. The Majority Stockholders, however, took the position that they had

no objection to the consolidation into Docket No. 5770 of any and all bona fide proposals for purchasing control of Lake Central. But in this regard the Majority Stockholders objected to any attempts to "use the processes of the Board—or to misuse them—for the purpose of trying to deprive Lake Central and its Majority Stockholders of their property without reasonable compensation and without due process of law."

The Lake Central Majority Stockholders closed their Answer and Reply to Transport by saying: "Accordingly, we support the request of Lake Central that the scope of the proceeding in Docket 5770 be confined to the issue of the acquisition of Lake Central; that all applications, petitions and motions inconsistent therewith be denied or dismissed; and that we be given such other further and different relief as to the Board may appear appropriate."

26. In view of the evidence, the court concludes that from the standpoint of North Central alone, the application to have its own routes extended to cover those of Lake Central's Route 88 at the time it was filed, was asserted to be a protective measure, but in view of the unconditional nature of its application to extend its operations to cover Route 88, it is difficult to determine whether the defendant at the time it filed its unconditional application also had other motives beyond the protection of the object of the Contract, thus causing its action not to be in good faith. It is the plaintiffs' position that it did have other motives, in view of its subsequent course of conduct, particularly in light of a common sense construction of the terms of the Contract with respect to defendant's right to file for Lake Central's Route 88 during the pendency of the acquisition proceedings. This can best be told by a consideration of its subsequent actions and the alternatives open to it at the time its application was filed which would not do violence to the contractual relationship between the parties.

Admittedly, North Central's primary interest was the obtaining of Lake Cen-

tral's routes by the purchase of Lake Central's stock pursuant to the Contract. The protective alternatives which were open to North Central at the time it filed its application were, first, it could have sought the consent of the Lake Central Majority Stockholders to take the action which it did in filing for Route 88; second, it could have filed its application expressly setting out the condition that it was to be considered only in the event the C.A.B. should disapprove its acquisition of Lake Central's stock in Docket No. 5770; third, it could have simultaneously sought intervention in the other application proceedings for Lake Central's routes then pending so as to oppose their applications in view of its contract to purchase the controlling stock of Lake Central. Thus, North Central, notwithstanding the alternative protective measures available, chose to pursue the unconditional course in violation of its contract with the Lake Central Majority Stockholders, as will be hereinafter construed. North Central's only explanation for having filed its application in the manner in which it did, is that its counsel considered it to be "proper form," and that it was justified in doing so by reason of the fact that the Lake Central Majority Stockholders had been negotiating with other airlines to purchase their stock.

In this connection, the court fails to find any evidence in the record tending to prove that in any negotiations with other airlines to purchase the Lake Central stock, the Lake Central Majority Stockholders failed to recognize their obligations under the Contract. It seems to the court, in view of the uncertainty of the Contract coming to fruition by reason of the contingency of C.A.B. approval of the acquisition of the Lake Central stock by North Central, any dealings with other buyers, without more, would not necessarily be inconsistent with their intent to perform the Contract.

North Central's stated purpose in filing for Lake Central's Route 88 was to protect itself in the event the C.A.B. should order consolidation of the other route applications with North Central's acquisition case in Docket No. 5770. The court notes that North Central was aware that its application under Section 401 of the Act was out of order and inconsistent with its application under Section 408 of the Act and that it was prematurely filed when it said in its "Opposition to Motions for Consolidation":

"The applications of North Central Airlines, Inc., Ozark Air Lines, Inc. and Transport Airgroup, Inc. must be considered as requests for authority to substitute for the service for which Lake Central is presently authorized. By the very nature of the authority requested, the public convenience and necessity would not support duplicating services over what is now known as Route No. 88. So long, therefore, as Lake Central's authority remains effective, it would appear that the applications referred to above are premature and should not be heard at this time, much less consolidated with Docket No. 5770."

The C.A.B. on July 9, 1953, denied consolidation of all certificate applications with Docket No. 5770, and it was more than a year later on October 27, 1954, at a time following the alleged wrongful delays in the acquisition proceedings, that the C.A.B. decided to consolidate such certificate applications into Docket No. 5770, at which time it also extended Lake Central's temporary certificate to December 31, 1955.

Had North Central been concerned only with the matter of the consolidation of other applications with the acquisition case, and its own protection in regard to the consolidation, and had it had due regard for the terms of its contract with the Lake Central Majority Stockholders, it appears to the court that North Central would have dismissed its application under Section 401 of the Act. Its failure to do so is persuasive evidence of lack of good faith in connection with its filing of an unconditional application for Lake Central's Route 88 and a disregard for

its obligation under the Contract. North Central adopted a "wait see" attitude, knowing at the time that Lake Central as an operating airline was in desperate financial circumstances, and that its right to serve Route 88 was tenuous and subject to possible revocation at any time.

From the foregoing the court concludes that although North Central designated its inconsistent action at the time of its filing for Lake Central's Route 88 as being protective in nature, it also served as a method to obtain Route 88 by a direct course without the attendant obligations of the Contract. The court therefore finds that the defendant was motivated by desires beyond the mere protection of the object of the Contract and of its rights under the Contract to acquire Route 88.

27. Having found that the defendant was motivated by considerations other than that of solely protecting the object of the Contract by the filing of its application for Route 88 during the pendency of its application to acquire the majority stock from Lake Central, the court now turns to the question of whether North Central's action in applying for Route 88 was a violation of the written terms of its contract with the Lake Central Majority Stockholders and thus amounted to a breach thereof.

The only express provision of the Contract bearing on the filing of an application by defendant for Route 88 is Paragraph 19 thereof, which provides:

"19. Nothing in this Agreement shall prevent Wisconsin Central Airlines from applying for all or any part of the routes covered in the Lake Central Airlines Renewal Case. Docket No. 4034, in the event that the Board disapproves Wisconsin Central's acquisition of Seller's stock."

The parties are at complete odds as to the meaning of this paragraph for plaintiffs regard it as an implied negative covenant that prior to disapproval of the stock acquisition case by the C.A.B. under Section 408 of the Act, North Central will forbear from applying for Lake Central's routes under Section 401 of the Act. Plaintiffs point out that the circumstances in which Lake Central's routes were being operated at the time of the agreement were such as to necessitate forbearance on the part of North Central from applying for Lake Central's routes until after the acquisition was disapproved. On the other hand, defendant regards Paragraph 19 as a limitation on a negative covenant that might be otherwise implied.

Defendant argues that considering the language of Paragraph 19 alone, two things are to be noted. First, the language used is not that of a negative covenant, for it does not provide that the defendant shall not file an application for Lake Central's routes *unless* and *until* the C.A.B. disapproves the Contract. On the contrary, defendant says, the language used is designed to make it clear that defendant is not to be precluded from filing such an application. Further, that from the words used, the obvious intention was to relieve defendant from some limitation that might be claimed to arise from the agreement itself, and the normal rule is that the language of a contract must be given its usual and natural significance. Second, that the final phrase, "in the event that the Board disapproves Wisconsin Central's acquisition of Seller's stock" is an ambiguous limitation, for it may be read as a time limitation (so as to mean that nothing shall prevent defendant from applying for Lake Central's routes after the Board disapproves the stock acquisition) or as a limitation on the *character* of such an application (so as to mean that nothing shall prevent defendant from making an application for the routes *conditional* on disapproval of the stock acquisition).

Paragraph 19 cannot be construed as an isolated provision of the Contract but must be construed in the light of the entire contract. Paragraph 15 of the Contract provides:

"15. If all of the approvals specified in Paragraph No. 7 of this Contract cannot be procured from the Civil Aeronautics Board, then this

contract shall be void and no force or effect whatsoever and all the parties shall be relieved herefrom."

Among the approvals specified in Paragraph 7 is the approval of the C.A.B. of defendant's acquisition[1] of Lake Central's stock and of the *Contract*.[2] In view of these provisions, if the C.A.B. disapproves defendant's *acquisition* of the Lake Central stock covered by the *Contract*, the Contract is void and of no force and effect by virtue of Paragraph 15.

Defendant proceeds with its argument by saying that if all Paragraph 19 means is that nothing in the Contract shall prevent defendant from making a route application *after* the C.A.B. disapproves the stock acquisition, then it has no meaning at all, for on such disapproval the Contract becomes null and void by the express terms of Paragraph 15 and Paragraph 19 thus accomplishes nothing and confers no right on defendant that would not exist independently by virtue of Paragraph 15. That on the other hand, if Paragraph 19 is construed to mean that nothing in the Contract shall prevent defendant from making *at any time* an application for routes *conditional on disapproval* of the stock acquisition, then it takes on real meaning, for it then becomes clear that such a conditional route application, filed before the stock acquisition proceeding has been determined by the C.A.B., will not violate the covenant implied in every contract that neither party will defeat or make impossible the performance of the contract.

■ Defendant's argument falls of its own weight. As pointed out in defendant's own brief, it has been authoritatively held, "If possible, a court will give effect to all parts of an instrument, and a construction which gives a reasonable meaning to all its provisions will be pre-ferred to one which leaves a portion of the writing useless or inexplicable." E. I. DuPont deNemours Co. v. Claiborne-Reno Co., 8 Cir., 1933, 64 F.2d 224, 228, 89 A.L.R. 238, certiorari denied 290 U. S. 646, 54 S.Ct. 64, 78 L.Ed. 561. Therefore, in view of Paragraph 15 of the Contract, providing that the Contract shall be void and of no force or effect if the C.A.B. disapproves the stock acquisition, Paragraph 19 would be absolutely meaningless if it were construed to be applicable only to the situation which would arise after the C.A.B. disapproved North Central's acquisition of Lake Central's stock. This, then, leads the court to conclude that in order to give Paragraph 19 any meaning at all, without rewriting it for the parties, it must be read as a time limitation, applying to the time during which the Contract is in force and before the C.A.B. has disapproved the acquisition of Lake Central's stock.

Paragraph 19 regulates the conduct of North Central in relation to time. It has more than one effect, though only one is expressed. The expressed effect is that a certain course of conduct (filing for Route No. 88) *is permitted after* the occurrence of a certain event, if it occurs (disapproval of C.A.B.). The words "only after" do not appear; the necessary and inescapable implication, however, is that the same course of conduct is *not* permitted—or, that is, it is prohibited—*prior* to the occurrence of that event, else the paragraph is meaningless.

■ The court agrees with plaintiff's construction of Paragraph 19, particularly in view of the circumstances under which the agreement was made, and, that a violation of the implied covenant to forbear from applying for Lake Central's routes under Section 401 of the

---

[1], 2. It must be emphasized and borne in mind that there is a vital distinction between the Board's approval of the acquisition of Lake Central's stock and the Board's approval of the Contract. The first is governed by Section 408 of the Act, 49 U.S.C.A. § 488 and the latter is governed by § 412 of the Act, 49 U.S.C.A.

§ 492. It is entirely possible for the C.A.B. to approve the acquisition of one airline by another as being in the public interest but at the same time disapprove the terms of the contract covering the transaction as being adverse to the public interest. Paragraph No. 7 of the Contract recognizes the distinction.

Act during the pendency of the stock acquisition proceedings under Section 408 of the Act, did constitute a breach of the Contract.

28. Certain results and characteristics of the filing by North Central are noteworthy in a consideration of the issue of materiality of the breach:

(a) By applying for authority to extend its routes to cover those served by Lake Central without consent and approval of the Lake Central Majority Stockholders, North Central immediately brought about an adversary relationship between itself and the Lake Central Majority Stockholders. The Lake Central Majority Stockholders immediately were required to employ counsel and oppose the application. In other words, by filing the application under Section 401 of the Act, a change in the position of the parties was caused under the Contract.

(b) By the filing of such application the value of the Lake Central stock was jeopardized.

(c) The Contract contained an option in favor of the defendant. Paragraph 4 of the Contract in part reads as follows:

"If the net book value of Lake Central Airlines, Inc. as of the cut off date of and including the award in the initial permanent Mail Rate Settlement including losses arising out of a crash of a Beechcraft Bonanze airplane on August 21, 1952, plus $10,000.00 is negative at option of the Buyer, the Buyer may within 60 days perform, sell, assign, transfer or void this contract."

This paragraph of the Contract placed North Central in a superior position with respect to any hazards which might befall Lake Central in its tenuous circumstances. By filing its application under Section 401 of the Act, North Central injected an additional peril to Lake Central's already tenuous right to fly Route 88. Since it has already been found that North Central's primary interest was the acquisition of Lake Central's routes, any action on the part of North Central which would tend to depress Lake Cen-

tral's net book value, plus $10,000, to a negative point, thus giving North Central the right to exercise the option to void the Contract, while at the same time having on file its application for Lake Central's routes under Section 401 of the Act, favored North Central to the detriment of Lake Central under the terms of the Contract. North Central had knowledge of Lake Central's critical financial circumstances at the time it filed the application.

(d) At the time North Central filed its application to extend its own routes so as to cover those being served by Lake Central, North Central itself was in critical financial circumstances, as will be more fully developed in subsequent findings. Therefore, the likelihood of North Central's future performance of the Contract in view of its action in filing for Route 88 under Section 401 of the Act became more uncertain. Also, by filing the application, its willingness to perform in the future under the terms of the Contract was thrown in doubt.

(e) By North Central's action in filing for Lake Central's Route 88, Lake Central stood to suffer greater hardship than North Central. The defendant thereby had nothing to lose and stood to gain, whereas the Lake Central Majority Stockholders were subjected to possible total loss under the Contract.

■■ In view of the foregoing, the court concludes that North Central's breach of the Contract in filing its application to extend its own routes to cover those served by Lake Central during the pendency of the stock acquisition proceedings was a material breach.

29. North Central's application under Section 401 of the Act for Route 88 was never withdrawn after the Weesners notified North Central that the filing of the application constituted a breach of the Contract. Neither did the Weesners ever acquiesce in North Central's filing for Route 88.

30. The next problem confronting the court is the determination of whether defendant's breach of the Contract by fil-

ing for Lake Central's Route 88 was waived by the Weesners, the Lake Central Majority Stockholders. In respect to this issue, the parties are also at complete odds. The plaintiffs take the position that the breach of contract was never waived and that the Weesners continued to recognize the existence of the Contract in the acquisition proceedings. Defendants argue that the Weesners never at any time gave the defendant a clear, unequivocal and prompt notice of its election to terminate the Contract as a result of the alleged breach nor did they ever elect to rescind the Contract.

The defendant also points out that on two occasions after Roscoe P. Weesner's letter of May 16, 1953, to defendant, the Weesners asked the defendant to agree to a cancellation of the Contract and the defendant further contends that the Weesners as late as February, 1954, offered to cancel the Contract but the latter offer is in dispute.

But the plaintiffs counter this argument by saying: "Since the relief sought by plaintiffs is not rescission, there was, of course, no necessity for giving notice of an election to rescind." Further that: "The plaintiffs, even now, are under no duty to perform, for under the terms of the contract, the time for performance has not arrived and will not arrive until and unless the C.A.B. approves the stock acquisition case. Thus, technically, there can be no abandonment of the Contract by plaintiffs until such time as they have a duty to perform. It would have been perfectly proper for plaintiffs to have said nothing and, at such time as their performance became due, if ever, to refuse to perform because of the vital breaches by defendant. All that this action encompasses is for a judicial declaration that these plaintiffs have a right to be so discharged."

It is well, therefore, that the court analyze and construe the action of the Weesners in this respect. For that purpose the court will set forth the following letters or pertinent parts of letters addressed to North Central or its general counsel, Mr. Wheeler, and to the C.A.B.,

wherein the Weesners state their position regarding the breach:

Roscoe P. Weesner's letter of May 16, 1953, to North Central—

"We regard the filing of said application as being inconsistent with and in conflict with the provisions and purposes of said contract and as a substantial breach of your obligations thereunder.

"Consequently, it is our opinion that we are not legally bound to transfer any stock to you under said contract, that we are entitled to elect to rescind or terminate said contract if we so desire, and that we are entitled to recover from you for any damages sustained by us as a result of your breach of your obligations under said contract."

Letter of Charles S. Murphy, counsel for the Weesners, under date of July 29, 1953, addressed to Wheeler & Scoutt, counsel for North Central—

"Mr. Roscoe P. Weesner was here yesterday and discussed with me at length the Lake Central acquisition matter, and particularly your letter to him of May 25th.

"He asked me to inform you that your letter of May 25th does not alter his view that North Central has breached its agreement of October 17, 1952. As you point out in your letter, paragraph 19 of the contract does contemplate the possibility that North Central might apply for the routes certificated to Lake Central. But that is only in the event the Board disapproves North Central's acquisition application, and that event, of course, has not occurred."

Letter of August 6, 1953, of Charles S. Murphy, counsel for the Weesners, addressed to Wheeler & Scoutt, counsel for North Central—

"Be that as it may, Mr. Weesner's view is that North Central has committed a breach of the Contract and he is not waiving the breach.

"If, in these circumstances, North Central elects to continue to prose-

cute its application in Docket No. 5770, it does so at its own risk. If the C.A.B. should approve the acquistion of the stock by North Central, it would be Mr. Weesner's view that by reason of North Central's breach of the contract he would be free of any obligation to deliver the stock if he elected not to do so."

And finally, the letter of March 16, 1954, addressed to Hon. Chan Gurney, Chairman, Civil Aeronautics Board (of which North Central had no knowledge)—

"As you perhaps know, Lake Central's majority stockholders have taken the position that North Central has committed a breach of its obligations under the acquisition contract and that, consequently, Lake Central's stockholders are no longer bound by its terms. Our position on this matter is set forth in an exhibit (Exhibit LCMS–3)[3] which we have filed in Docket 5770. A copy is enclosed for your convenience. Also, we have indicated to North Central that we would agree to a complete cancellation of the contract, but North Central has declined.

"Further, in view of the enlargement of the scope of this proceeding by the Board's Orders No. E–7543 and E–7838, and in view of the effect on the situation of the settlement in the Lake Central Mail Rate Case, the majority stockholders are now exploring with other interested parties possible proposals which may be considered by the Board in Docket 5770 in the event that it does not approve the acquisition of Lake Central's stock by North Central.

" * * * If it appears after a reasonable time that no further proposals are likely to be developed to put before the Board in this case, we would request that the Board proceed to dispose of the case in order to clear up the situation so that plans can be made for Lake Central's future."

■ 31. Plaintiffs do not ask to rescind the Contract, so it is not necessary to consider whether their right to such relief has been waived.

As reflected by the letters heretofore quoted, the whole course of conduct on the part of the Lake Central Majority Stockholders is inconsistent with any contention that they waived the breach committed by the defendant in filing for Lake Central's route. Their letters show that they were meticulously careful not to say anything which could be construed to indicate that they had waived the breach. At no time did they consent to or rely upon the action taken by North Central in filing for Lake Central's route. Even before making an accusation of breach of contract, they obtained the legal services of competent counsel and relied upon his opinion that a breach had been committed. The facts before the court wholly fail to support defendant's contention that they acquiesced in the defendant's action in filing for Lake Cen-

---

3. Lake Central Majority Stockholders' Exhibit LCMS–3 was the correspondence exchanged between Roscoe P. Weesner and North Central and between counsel for North Central and counsel for Lake Central regarding the alleged breach of contract and their dispute over the interpretation of Paragraph 19 of the Contract. See Items 27, 28, 29, 30 and 31 of the Stipulation of Facts in this case. The exhibit is alluded to in Item 43 of the Stipulation of Facts in this case which is entitled "Lake Central Majority Stockholders—General Statement" filed before the C.A.B. in Docket No. 5770 et al., and which was signed by William H. Kreig and dated September 3, 1953. In describing the position of the Majority Stockholders, Mr. Kreig stated, "It is the position of the majority stockholders that North Central has committed a breach of its obligations under the contract and that, consequently, the majority stockholders have an election to refuse to transfer their stock to North Central. Several letters on this subject have been exchanged between the Majority Stockholders and North Central and their respective attorneys. Copies of that correspondence are included herein as Exhibit LCMS–3."

tral's routes. At every step of the way after North Central filed its petition under Section 401 of the Act, they opposed it.

32. While a fair reading of the letters fails to show a final election to terminate the Contract, it is, on the other hand, abundantly clear that Lake Central did not elect to continue the Contract in such a way as to bind themselves again in spite of the breach.

Further, in regard to the letters, it is worthwhile to note from the record before the C.A.B., that the parties regarded themselves to be before the tribunal, that is the C.A.B., which would pass upon the question of a breach. The matter was still in a fluid state.

An attempt was made by defendant through its witness, Wheeler, to establish waiver of the breach on a certain statement made by Charles S. Murphy, counsel for the Lake Central Majority Stockholders, in a telephone conversation on February 10, 1954. The court has carefully weighed the evidence on this point in the light of the rules on credibility and burden of proof and finds that the evidence does not preponderate in favor of the defendant.

Contrasting the two remedies, which defendant has here failed to contrast, within the framework of the election-waiver defense, Williston says:

"* * * in order to exercise his right to rescind a contract, an injured party must ordinarily indicate his election so to do by positive action, but if he wishes only to refrain from performing his part of the contract, he is not seeking to assert an affirmative right, but standing on the defensive. He need ordinarily do nothing except refrain from performing and from receiving performance until he sues or is sued, when he should plead the cause which justifies his non-performance. Of course, he may by manifesting an election to continue the contract deprive himself of this justification, but positive action on his part is nec-

essary to bring this about." 3 Williston, Contracts, § 1304 (1937 Ed.)

▮▮▮ In view of the evidence as construed in the light of the authority as above set out, defendant's argument that the Lake Central Majority Stockholders waived the breach by failing to make a timely election to rescind or terminate the Contract after notice of the breach, is completely without merit. The time for performance on the part of the Weesners or their successors in interest has not yet arrived and cannot until the C.A.B. has rendered its decision in Docket No. 5770. By bringing this action, the Weesners and their successors in interest have obviously elected not to perform, which they have the right to do.

33. On May 19, 1955, Section 401 of the Act was amended directing that existing temporary certificates be made permanent. By that time the Lake Central Majority Stockholders' right to be discharged from performance of the Contract by reason of the breach had become fixed. This action was filed by the plaintiffs herein on May 10, 1955.

### Alleged Breach Caused by Delays in C.A.B. Docket No. 5770

34. At the time the Contract was being negotiated, the parties thereto contemplated that the necessary application to the C.A.B. for approval of the Contract would take from six to eighteen months to be processed, and that a C.A.B. decision in the Lake Central initial permanent mail rate case (which was necessary to a determination of the purchase price specified in Paragraphs 2 and 4 of the Contract) would take substantially longer to obtain. See Findings No. 5 and 6.

35. The defendant acted promptly in filing in C.A.B. Docket No. 5770 on October 1, 1952, its application for approvals as specified in the Contract, and generally, in all respects acted promptly in the early stages of the acquisition proceedings. An amended application to cover the Contract of October 17, 1952, was filed on November 3, 1952.

36. A pre-hearing conference in Docket No. 5770 was held on March 19, 1953. In the meantime, Ozark had filed its application for Lake Central's routes under Section 401 of the Act and petitioned for permission to file application to be considered as a potential and competing purchaser of the Lake Central stock. On March 19, 1953, the date of the pre-hearing conference, Transport filed its application for Lake Central's routes under Section 401 of the Act and likewise asked for permission to file its application to be considered as a potential purchaser of the Lake Central stock. Both Ozark and Transport requested that their petitions be consolidated with defendant's application for approval of the stock acquisition in Docket No. 5770.

At the pre-hearing conference, counsel for the C.A.B. indicated he would recommend that a general investigation be instituted and consolidated with Docket No. 5770. Defendant opposed the intervention of the other petitioners, together with the route applications, and asked that such applications and the investigation be kept out of Docket No. 5770 and that the matter be set for a prompt hearing. Counsel for the defendant then took the position that it would be forced to file an application for a certificate to Route No. 88 as a protective measure.

W. W. Weesner, who attended the pre-hearing conference for the Weesner group, the Lake Central Majority Stockholders, made no objection to the proposals of Ozark and Transport to be considered potential stock purchasers. As heretofore stated in Finding No. 16, the record does not satisfactorily disclose what position, if any, was taken by W. W. Weesner at the pre-hearing conference with respect to the other applications for Lake Central's routes under Section 401 of the Act. As stated above, Transport had not filed its certificate application for Route 88 until the date of the conference, and it was filed under another docket number (Docket No. 6025).

37. On March 25, 1953, defendant filed an unconditional application in Docket No. 6043 for a certificate to Route 88 and requested consolidation with Docket No. 5770.

38. Thereafter, on April 13, 1953, the Lake Central management filed its Reply and Opposition to the various petitions and motions of Ozark, North Central and Transport. In its Reply and Opposition the Lake Central management took no position on the consolidation in Docket No. 5770 of any application which sought approval of the acquisition of control of Lake Central by the purchase of the majority stock of Lake Central. However, the Lake Central management strongly opposed any effort to inject into the acquisition proceedings any application or petition which had as its purpose the revocation, or suspension, of Lake Central's temporary certificate for Route 88. Lake Central's management asked that such petitions or applications to suspend or revoke its certificate for Route 88 be dismissed. It also asked the C.A.B. to deny or dismiss the motions and petitions of Ozark, North Central and Transport for consolidation of their dockets in Nos. 5826, 6043 and 6025, respectively, with Docket No. 5770. Lake Central's management petitioned the Board to confine the scope of the Docket No. 5770 proceedings to the issue of acquisition of control of Lake Central. See Finding No. 23.

39. On April 14, 1953, the defendant filed its opposition to motions for consolidation in which it requested that all applications for consolidation with Docket No. 5770 be denied, even including its own.

40. On April 21, 1953, Charles S. Murphy, an attorney employed by the Lake Central Majority Stockholders, filed his appearance in Docket Nos. 5770, 5826, 6025, 6043 and 6066, for and on behalf of the Lake Central Majority Stockholders.

41. On April 21, 1953, the Lake Central Majority Stockholders filed their written Answer and Opposition to the reply of Transport. In it, the Lake Central Majority Stockholders fully supported Lake Central management's opposition to consolidating into the acquisition proceedings in Docket No. 5770, any petition

for the suspension or revocation of the certificate of public convenience and necessity held by Lake Central or any application by another carrier for a certificate to Route 88. The Majority Stockholders took the position that the consolidation of any such petition or application into the acquisition case would substantially broaden the issues and would impose upon Lake Central and the Majority Stockholders an unjustifiable burden and expense. They did, however, take the position that they had no objection to the consolidation into Docket No. 5770 of any and all bona fide proposals for purchasing control of Lake Central. The Lake Central Majority Stockholders closed their Answer and Reply to Transport by saying: "Accordingly, we support the request of Lake Central that the scope of the proceeding in Docket No. 5770 be confined to the issue of the acquisition of Lake Central; that all applications, petitions and motions inconsistent therewith be denied or dismissed; that we be given such other further and different relief as to the Board may appear appropriate."

42. Thereafter, bureau counsel recommended that there be instituted and consolidated with Docket No. 5770 a merger investigation. On May 8, 1953, the C.A.B. examiner issued his notice to the parties in Docket No. 5770 in which they were given until May 13, 1953, to file replies to the bureau counsel's recommendation that the Board institute a merger investigation for consolidation with Docket No. 5770. Defendant opposed the proposal of the bureau counsel.

Lake Central's management did not receive a copy of the notice until May 11, 1953. On May 12, 1953, a regular meeting of the Board of Directors of Lake Central was held at which time consideration was given to the question of whether the management and Board of Directors of Lake Central should avail themselves of the opportunity to reply to bureau counsel's recommendation. It was determined that no such reply should be filed; but at the same time it was determined that the stockholders of Lake Central had a vital interest in the matter inasmuch

as a merger inquiry would involve their respective stock interests in the corporation. Accordingly, the Board of Directors sent notices to all the stockholders of Lake Central informing them of the bureau counsel's recommendation and announced a meeting of the stockholders to determine what action they wished to take under the circumstances. Lake Central being a Delaware corporation, ten days notice of such stockholders' meeting was required under the laws of Delaware. Lake Central's Board of Directors, under the Voting Trustee, requested the C.A.B. to extend the time within which replies to the bureau counsel's recommendation could be filed, for fifteen days, to May 28, 1953, in order that the position of Lake Central stockholders could be ascertained and the necessary documents prepared for filing with the C.A.B. On May 13, 1953, the C.A.B. hearing examiner advised Mr. A. F. Grisard, counsel for Lake Central's management, to the effect that inasmuch as it appeared that there was no proposed course of action which the stockholders were being asked to approve, that it was conceivable that no action would be taken at the stockholders' meeting and that therefore it did not appear desirable to delay further in the submission of the consolidation motion to the C.A.B. The hearing examiner observed, however, that should the stockholders take an affirmative position on the bureau counsel's recommendation, such position could be communicated directly to the C.A.B. for its consideration. Accordingly, the request to extend the time to May 28 in which to file the replies to the statement of position previously submitted by the bureau counsel was denied without prejudice to the submission of a revised position directly to the C.A.B.

On May 15, 1953, Mr. Grisard, on behalf of Lake Central's Board of Directors, advised the hearing examiner that notices had been issued to the Lake Central stockholders and they were instructed, "If the shareholders and holders of certificates of deposit issued by the Voting Trustee of Lake Central Airlines, Inc.

believe that the airline itself should take action, the shareholders and holders of certificates of deposit should hold a formal meeting and then instruct the Board of Directors as to what action they wish taken." Such notice was issued on May 12, 1953. Mr. Grisard's concern was that the submission of the matter to the C.A.B. might be acted upon before the position of the shareholders and holders of certificates of deposit could be ascertained and communicated to the Board. Again he requested that the C.A.B. be informed of the status of the matter and with respect to his request of May 12, and the reasons therefor, and again be suggested for the Board's consideration the possibility of withholding final action on the matter until at least May 28.

On May 19, 1953, the hearing examiner communicated with Mr. Grisard, stating that his request of May 15, 1953, that the Board be informed of the pendency of the Lake Central stockholders' meeting and the possibility of a further change in the airline's position with respect to the consolidation motions in Docket No. 5770 proceeding be submitted directly to the Board on or about May 28, was granted. The court finds that thereafter neither the Lake Central Majority Stockholders nor Lake Central's management opposed the proposed merger investigation.

43. On July 9, 1953, the C.A.B. issued its initial consolidation order determining the issues to be tried with Docket No. 5770. That order denied the consolidation of the route applications with Docket No. 5770, but instituted an investigation "to determine whether and upon what terms, the acquisition of the majority stock holding interest in Lake Central, by North Central, Ozark and/or Airgroup and whether, and upon what terms the acquisition of Lake Central's route No. 88, in whole or in part, by North Central, Ozark and/or Airgroup (Transport), is consistent with the public interest," and consolidated the applications to purchase of Ozark and Transport and the investigation with the application of defendant to acquire control of Lake Cen-

tral. The investigation was docketed as No. 6213.

44. On July 14, 1953, the C.A.B. hearing examiner scheduled the hearing in the Lake Central stock acquisition case for October 19, 1953.

45. On August 6, 1953, counsel for North Central requested a delay in the scheduled hearing date, giving as a reason therefor the unavailability of a key witness, Frank N. Buttomer, Vice President of North Central, on October 19, 1953. The request for delay was in the form of a letter. It read as follows:

"The hearing in the Lake Central Acquisition Case has been tentatively set for October 19th. One of our key witnesses, Frank N. Buttomer, Vice President of North Central Airlines, Inc. will not be available to testify at that time. Therefore, I would appreciate it if you would set another date for the hearing, preferably on or after November 16, 1953."

No affidavit accompanied the letter stating the reasons for the witness' unavailability nor as to the testimony which would be adduced through him.

The court finds also that no notice of this request was given to the Lake Central Majority Stockholders nor to their counsel of record. The evidence establishes that the witness was in Europe on a business and vacation trip with his family at the time the letter was written. No effort was made to procure the witness by having him return from Europe in time for the hearing.

46. On August 11, 1953, the C.A.B. hearing examiner granted North Central's request for delay and postponed the hearing date to November 30, 1953.

47. On September 10, 1953, Allegheny Airlines, Inc. filed a motion in Docket No. 5770 to enlarge the proceedings so as to determine whether and upon what terms Allegheny might acquire Lake Central's Route No. 88.

48. On October 21, 1953, the C.A.B. granted the request of Transport for leave to withdraw from participation in

Docket No. 5770 and further granted Allegheny's petition to intervene and made Allegheny a party to the investigation "on condition that future procedural dates are met."

49. On October 22, 1953, the C.A.B. examiner requested that exhibits pertaining to Allegheny's intervention be filed in sufficient time that the hearing, then scheduled for November 30, 1953, remain unchanged.

50. Prior to the date set for the hearing the parties had exchanged exhibits.

51. On November 23, 1953, counsel for North Central made their second request for a delay in the acquisition proceedings. This request also was in the form of a letter to the hearing examiner. It read:

"Lake Central Airlines, Inc. is now going through its Final Mail Rate Conferences. North Central Airlines, Inc. has an agreement to purchase the stock of Lake Central Airlines, Inc. based on its net book value. The net book value of Lake Central Airlines, Inc. will be based on the decision reached in the Permanent Mail Rate case. Therefore, it will be impossible to ascertain the purchase price of the stock of Lake Central Airlines, Inc. until after the Final Mail Rate decision in the Lake Central case. It will likewise be very difficult for North Central Airlines, Inc. to present provative (sic) evidence of its financial ability to satisfy such vague and speculative requirements. If the postponement is granted, North Central Airlines, Inc. will be able to ascertain with preciseness what is required and what must be presented by way of proof.

"Therefore, it is requested that the hearing in the Lake Central Acquisition Case be postponed until some time after the decision is reached and published in the Lake Central Permanent Mail Rate case. We believe that such a postponement may very well save the time of the Board's staff and the parties, and may prevent a subsequent reopening proceeding."

It is noted that the letter completely ignores the contemplation of the parties with respect to the Contract of October 17, 1952. It was their contemplation that the acquisition proceeding would precede the Lake Central Permanent Mail Rate decision and that the stock would be transferred within five days after the approval of the stock acquisition, and that thereafter the purchase price would be paid within thirty days after the date of the settlement of Lake Central's claim with the United States in its initial permanent mail rate determination case. See Findings No. 5 and 6. The court finds that officials of North Central were generally aware of the progress being made in Lake Central's mail rate case. Also during this time they were aware of the critical financial circumstances of Lake Central under its voting trustee's operations.

And it is noteworthy that North Central in September, 1953 was informed by the C.A.B. that the conferences in respect to its own final mail rate could not be held in September but had to be delayed until after January 1, 1954. See Finding No. 56 at page 45 hereinafter [144 F. Supp. 907].

52. On November 25, 1953, two days after North Central's second request for delay was made, the hearing examiner granted North Central's request and postponed the hearing date to January 18, 1954. Again the Lake Central Majority Stockholders had no prior notice of North Central's request for this second delay. There is no evidence in the record, however, to indicate that after the hearing date was ordered continued, the Lake Central Majority Stockholders made a protest to the C.A.B. hearing examiner, or that they requested that the hearing date be set for a date prior to the Lake Central mail rate final determination.

It was during this month of November that Lake Central's mail rate conference had taken place in the early part of the month. The complete submission of Lake

Central's mail rate case was made in September to the Mail Rate Section of the C.A.B. The Mail Rate conference had to be continued for additional information and a second conference was held thereafter. After the second conference Lake Central and the Mail Rate Section of C.A.B. were in substantial agreement. A final letter was executed by Lake Central to that effect in December, 1953.

53. On January 6, 1954, counsel for North Central made its third request for a delay in the acquisition proceeding. His letter was as follows:

"I have contacted Mr. Hamilton Hale, counsel for Allegheny Airlines, and Mr. James Batchelor, counsel for Ozark Airlines, and they advise me they have no objection to continuing the above case until the decision in the Lake Central Permanent Mail Rate Case is reached.

"While it is the desire of all of us to hear this case as soon as possible, it, nevertheless, will be beneficial to all concerned if the case is postponed until after the decision is released in the Lake Central Permanent Mail Rate Case."

It will be noted that copies of the request were sent to other counsel but not to counsel for the Weesners. However, counsel for the Weesners did have notice of the request prior to its being granted and an objection was made to the request, but the hearing examiner on January 14, 1954, overruled the objection, granted the request and postponed the hearing for approximately sixty days.

54. The Lake Central permanent mail rate decision was issued on February 16, 1954, fixing the fair and reasonable rates of compensation to be paid Lake Central for the period November 12, 1949 through June 30, 1953.

55. Following the issuance of the Lake Central permanent mail rate decision on February 16, 1954, James E. Birges, representing North Central's accounting firm, Alexander Grant & Co., in the company of Arthur Schwandt, an officer of North Central, visited the Lake Central offices in order to make a preliminary survey to gauge the effect of the proposed mail rate settlement as was indicated by a show cause order of the C.A.B. dated February 3, 1954, in respect to the final mail rate of Lake Central. On February 24, 1954, Alexander Grant & Co., through Mr. Birges, made its report to Howard A. Morey, president of North Central, covering the results of his survey. This report is relevant to the dispute of the parties as to whether a purchase price was agreed upon within the 30-day period following the final order of the C.A.B. dated February 16, 1954, fixing the permanent mail rate. The report is also significant in that it reflects the critical financial circumstances of Lake Central during the period over which the delayed proceedings were pending before the C.A.B. and the amount of cash that would have been required to purchase Lake Central's stock and assume operations at that time.

Pertinent parts of the report reflect the following:

"Purchase Price and Additional Cash

"(1) For these purposes the cutoff date has been considered as June 30, 1953. At that date the net book value (excess of assets over liabilities) totaled $84,619. Therefore, the purchase price for 80,054 shares of capital stock would be $81,655 plus $10,000, or a total cost of $91,655. These figures are subject to audit as provided in the contract.

"(2) The minimum additional cash required during the coming year to operate this airline is estimated at $225,000.

"Determination of Net Book Value of Company.

"At June 30, 1953, the net book value showed a deficit of $136,873. Applying the additional mail pay receivable at that date of $187,454 together with other adjustments indicated in the order, results in adjusted un-audited net book value of $84,-

619 or $1.02 per share which when applied to the 80,054 shares to be acquired totals $81,655.

\* \* \* \* \*

"Paragraph 3 indicates that the purchase price for the capital stock is to be paid in cash within thirty days after settlement of the mail rate case. The auditors, Ernst & Ernst, have not begun the examination of the Lake Central June 30, 1953 financial statement and it is not likely that certified financial statements will be available within the thirty day period. In view of the situation, we recommend that legal counsel be consulted to determine the effect of the thirty day clause and the date of settlement."

Later on in the report it is pointed out:

"At November 30, 1953, after giving effect to the final mail rate settlement and other adjustments, the company's working capital position showed a deficit of $260,000 and a bank overdraft of $75,000. The deficit position at November 30, 1953, is after the inclusion of $262,598 of additional mail pay. Therefore, the November 30, 1953 balance sheet shows that after the final mail rate settlement and the increased permanent mail rate, the company is still confronted with an extremely serious working capital deficit."

The report went on to point out that if it were assumed that during a year's period, funds were expended only in operations, the working capital deficit at June 30, 1954 would be increased to approximately $305,000. This was based upon the losses sustained by Lake Central after giving effect to the permanent mail rate for the five-month period ending June 30, 1953, and upon the anticipated losses for the period December 1, 1953 to January 30, 1954, in the amount of $45,000.

The report also drew attention to the matter of a demand note of $55,000 to Nationwide Airlines, Inc. which the accountants considered to be of particular importance.

In conclusion, the report stated:

"It appears that the purchase price for the capital stock will total $91,655. Additional cash of $225,000 is needed to pay the notes, reduce the trade accounts payable and provide additional working capital. Therefore, not considering the cash liability for protective labor provisions it appears that $317,000 is needed for the stock purchase and working capital advance."

As stated above, the parties are in dispute as to whether an agreement was reached on behalf of North Central by Mr. Birges and Mr. Schwandt with Mr. Hartman of Lake Central's management, as to the purchase price of the Lake Central stock at the time the two representatives of North Central visited Lake Central's offices.

The court finds from the evidence that the accountant, Mr. Birges, and Mr. Hartman of Lake Central's management, did arrive at a figure representing the purchase price of the stock but subject to a final audit; however the court fails to find from the evidence that either Mr. Birges or Mr. Schwandt was authorized to agree upon a definite purchase price and there is no showing that Mr. Hartman was authorized to act on behalf of the Lake Central Majority Stockholders. The court also finds that the audit to be conducted by the firm of Ernst & Ernst was not waived at the time of the meeting between such parties, and bases its conclusion upon the report of the accounting firm wherein mention is made of the audit to be performed by Ernst & Ernst.

56. Plaintiffs in effect charge that the defendant sought the delays in the stock acquisition case in bad faith and that the reasons set forth in the various requests for delays were not the "real reason" for the requests; that the real reason North Central sought the delays was that it was in critical financial circumstances and therefore was not able to perform at the time performance was required as contemplated by the parties when the Contract was made.

There is considerable evidence in the record to support the plaintiffs' position. For example, plaintiffs' Exhibit B is a copy of defendant's petition for amendment of its own temporary mail rate order for the transportation of mail over its Route No. 86. The petition is most telling in respect to North Central's financial circumstances, both prior to and during the period of the alleged wrongful delays. It was filed on December 23, 1953.

In the petition the defendant stated:

"C. Petitioners Past Request to Increase Rate

"Petitioner has made a diligent effort since March, 1953, to familiarize the Board with its mail pay needs for the current winter months and the year 1954. On March 31, 1953, Petitioner requested the Board to set its temporary rate so as to yield the Petitioner 57.53 cents per plane mile. The Board in its decision Order Serial No. E–7491, dated June 18, 1953, reduced Petitioner's effective rate from 60.04 cents per mile to 50.02 cents per recognized mile.

"On June 30, 1953, Petitioner again requested the Board to review its temporary rate and pointed out that a 50.02 cents effective rate was inadequate for Petitioner's operation. The Board in its decision Order Serial No. E–7637, dated August 17, 1953, increased Petitioner's effective rate to 53.61 cents per recognized revenue plane mile. Petitioner accepted this rate knowing that it was inadequate for its needs and was approximately four cents per mile below its estimated requirements previously submitted to the Board on March 31, 1953. Petitioner was informed that its final rate conferences would begin in September, 1953, and at that time a re-examination of Petitioner's rate and experience would be made.

"Petitioner's effective rate of 53.-61 cents per revenue plane mile beginning July 1, 1953, was inade-quate. This rate was ten cents per recognized mile less than it received for last year's operations and four cents per mile less than Petitioner's minimum estimates. It did not permit Petitioner to earn sufficient profits in its good traffic months from July through October so as to enable it to operate through the less productive and more expensive winter pe_ _-od of late 1953 and early 1954. As a result Petitioner enters the winter months of December, 1953, through April, 1954, in critical financial condition.

"In September, 1953, Petitioner was informed that conferences on its final mail rate could not be held in September, but must be delayed until after January 1, 1954. This delay in re-examination of the Petitioner's rate in its final rate conferences coupled with the continued withholding of its return on its investment for two and one-half years has imposed upon the Petitioner severe and unbearable financial hardships.

*       *       *       *       *

II.   Petitioner Requests That Its Rate Be Increased

A.   Past Rate Is Inadequate

"Attached hereto and made a part hereof is Exhibit 'A' which shows Petitioner's forecast for July through November, 1953, as submitted to the Rate Staff for its final mail rate conferences. The accuracy of Petitioner's forecast is demonstrated by the fact that its actual break-even need varied only $15,500 from its estimates. The difference is exceedingly small considering the estimate involved $2,181,945 of expenses and $1,096,478 of revenues.

"Attached hereto and made a part hereof is Exhibit 'B' which shows Petitioner's break-even need from June 14, 1951 to November 30, 1953. This exhibit shows a loss of $175,210 or 2.95 cents per revenue plane mile. This loss is a part of Petitioner's

problems. The systematic drain on Petitioner's working capital brought about by, among other things, a depressed mail rate has aggravated Petitioner's working capital to the point that Petitioner cannot continue operating unless some relief is promptly granted.

"B.   Petitioner's Need

"Petitioner's operation in the Minnesota, Michigan and Wisconsin area is substantially different from the other operating local service airlines. Intense cold, heavy snow and low operating performances in the winter months contribute to the high cost and depressed traffic. The results of these severe winter operations has been that Petitioner has suffered substantial operating losses during these periods. Petitioner estimates that between December 1, 1953, and April 30, 1954, on its present mail rate, Petitioner will sustain a loss of $145,938 or 8.91 cents per revenue plane mile.

"Petitioner believes that from May through November it can operate on its present effective rate of 53.61 cents per recognized revenue plane mile as set by Order Serial No. E–7636. However, during the winter operating months from December 1, 1953 to April 30, 1954, an increased mail rate of 8.91 cents per revenue plane mile is absolutely necessary.

"C.   Petitioner's Financial Condition

"Petitioner is aware that its final mail rate conferences are imminent and at that time its financial needs will be reviewed and reappraised. However, the Petitioner would be remiss in its duty to the Board and the public, if it did not inform the Board that because of delays in setting Petitioner's final rate and the reappraisal of its operation connected therewith, Petitioner will be unable to continue operation unless some relief is granted.

"Attached herewith and made a part hereof is Exhibit 'D' which is Petitioner's balance sheet and profit and loss statements as of November 30, 1953. The profit and loss statement shows that the Petitioner suffered a loss of $51,061 for November, 1953, and a loss of $187,718 from January through November 30, 1953.

"Exhibit 'E' attached hereto and made a part hereof shows Petitioner's Cash Forecast from December 1, 1953, to April 30, 1954. This forecast, estimates a cash deficit on December 31, 1953, of $102,758 and by April 30, 1954, a deficit of $242,892. This cash projection represents the amount of money necessary for Petitioner to continue operations through April 30, 1954."

On February 12, 1954, the C.A.B. through its chairman, Chan Gurney, recognized the critical financial condition of North Central and expressed grave concern. In his letter to Mr. H. A. Morey, president of North Central, he had this to say:

"Based upon the most recent balance sheet, as of November 30, 1953, filed with the Board, your company reports a sizeable negative working capital position which you say has continued to grow worse since that date. Because of this situation North Central has been unable to meet its current obligations in the absence of substantial cash assistance.

"The Board has provided increased temporary mail pay of $110,-000 by its order of February 8, 1954 (Order No. E–8087) which is the maximum that can be allowed consistent with established Board principles. We recognize, however, that this additional sum will not substantially alleviate the carrier's critical financial condition. Nor can we foresee that the profit element to be awarded the carrier in the final rate will provide the cash necessary to re-

plenish your working capital to any appreciable extent. Of course, it should be understood, as the Board has repeatedly said in its mail rate opinions, that it is not a function of mail pay to meet capital requirements.

"North Central's financial problems are of grave concern to us. The Board must emphasize that the carrier has exhausted the temporary rate review as a means of meeting its present critical financial problems and cannot expect further temporary mail pay relief for these problems. The Board, therefore, must again place the management of the company, including its Board of Directors and officers, on notice that the solution of the carrier's problems is the immediate responsibility of management. Moreover, we anticipate that steps are and will be taken by management to meet and correct the current difficulties.

"Copies of this letter have been forwarded to each of the members of the Board of Directors.

"Sincerely yours,
"/s/ Chan Gurney
"CHAN GURNEY
"Chairman"

57. Notwithstanding the oral testimony of defendant's witnesses to the effect that North Central at all times was ready, able and willing to purchase Lake Central's stock, the court finds that it may have been willing but it certainly was not ready and able at the time it was procuring the delays in the stock acquisition proceeding. At that time its liabilities far exceeded its assets. The record before the C.A.B. speaks louder and more convincingly than the testimony of its witnesses. During the crucial time here in issue, North Central was in critical financial circumstances, virtually bankrupt, as one of its witnesses testified. This is exemplified by his answers to the questions put to him by plaintiffs' counsel:

"Question: Mr. Carr, in response to a question as to the financial condition of North Central, in March of 1954, put to you at the hearing before the Hearing Examiner on November 15, 1955, did you not respond, and I quote: 'The company had virtually no money in the bank. It had Five Hundred some odd thousand dollars in past due accounts payable; it had eighty thousand dollars borrowed from local banks on a 30-day note, with no way to pay it back. It had a Ninety Thousand Dollar pay roll coming up in two weeks, with no way to meet that, and a letter from the Civil Aeronautics Board saying that there would be no further emergency mail rate increase.' Did you make that statement under oath?

"Answer: I did.

"Question: On the same day, Mr. Carr, in response to a question of Mr. Grisard, the same day being November 15, 1955, the place being a hearing before Hearing Examiner Pfeiffer, in Washington, D. C., and in response to a question of Mr. Grisard as to whether North Central was not virtually bankrupt in 1954, did you not say, and I quote: 'I have so testified that is right.' Did you state that?

"Answer: I would have to check the record to be sure. As I recall, I did.

"Question: I see. And in response to another question, did you say: 'The only thing hanging over our head was complete bankruptcy.'

\*   \*   \*   \*   \*

"Answer: To the extent that you have read a part of my statement, I did say that, yes."

Transcript, pages 50–51.

58. In August of 1954, North Central issued its prospectus of a debenture offering in the amount of $300,000. By that time its financial circumstances had begun to improve. All of the net proceeds from such offering however, were required to meet its then existing needs and would not have provided capital with

which to purchase the Weesners' Lake Central stock and assume operations.

59. In view of the foregoing, the court finds that during the time in which defendant, North Central, requested and obtained three delays in the Lake Central stock acquisition case, its critical financial circumstances and the delay in its own final mail rate conferences until after January 1, 1954, were the real reasons it requested the delays, and not the reasons stated by North Central in its requests to the C.A.B. examiner.

60. North Central did not respond to Chairman Gurney's letter of February 12, until March 9, 1954, when Mr. Arthur E. A. Mueller, Chairman of the Board of North Central, answered a subsequent letter of Chairman Gurney of February 25, 1954, which was in the nature of an inquiry as to whether the parties were still interested in going forward with the stock acquisition proceedings. Mr. Mueller's letter of March 9, 1954, was as follows:

"Dear Mr. Gurney:

"Our Board of Directors have met and discussed the problem of going forward with our application in the Lake Central Acquisition Matter, Docket No. 5770 et. al. as set forth in your letter of February 25, 1954. We are of the opinion that we wish to go forward with our application in that case.

"We appreciate the consideration previously given us by extending the hearing dates. We have no objection to setting this matter down promptly for hearing, provided only that the hearing does not conflict with the hearings in the Chicago-Detroit Local Service Case, Segment 5 Renewal Case and our Permanent Mail Rate Case.

"The Board of Directors have requested me to answer your letter of February 12, 1954 with respect to our problems. I wish to advise you that our Board of Directors have employed a new President and General Manager as of April 15, 1954.

He is Mr. Hal N. Carr. Mr. Carr, as you probably know, is a director of North Central Airlines and intimately familiar with our operation. He is presently a member of the firm of McKinsey and Company, Management Consultants. We feel fortunate that we are able to attract this type of management to our company.

"I would also like to advise the Board that we are now negotiating privately and with several underwriters for the raising of additional capital. As these plans are completed, we shall advise you.

"Very sincerely,
"S/ Arthur E. A. Mueller
"Arthur E. A. Mueller"

The correspondence between Chairman Gurney of the C.A.B. and North Central leads the court to but one conclusion, that is, that as late as March 9, 1954, North Central was still pursuing a dilatory course of conduct in respect to going forward with the stock acquisition proceedings; that it is reasonable to believe that they would not have been ready to go forward for an indefinite period thereafter. That this was apparent is substantiated by a careful analysis of Mr. Mueller's letter of March 9, 1954. He speaks of the "problem of going forward" with the application in the Lake Central acquisition matter, in Docket No. 5770, et al., and he states that North Central had "no objection" to setting the matter for prompt hearing "provided only that the hearing does not conflict with the hearings in the Chicago-Detroit Local Service Case, Segment 5 Renewal Case and our Permanent Mail Rate Case." In other words, North Central's obvious concern was that the Lake Central acquisition matter not interfere with North Central's other petitions then pending before the C.A.B. It gave little regard to the Lake Central Majority Stockholders' interests.

61. Paragraph 4 of the Contract provides that the net book value of Lake Central Airlines shall be determined by an audit to be made and certified by

Ernst & Ernst, certified public accountants, "as of the cut off date of and including the award" in Lake Central's initial permanent mail rate settlement. That this was to be done within 30 days after the final order of the C.A.B. in Lake Central's permanent mail rate settlement is implicit in view of Paragraphs 2 and 3 of the Contract. Neither of the parties took steps to have such audit made within the 30-day period. Neither did the defendant make an offer to pay the purchase price as determined by its own accountants, Alexander Grant & Co., within the 30-day period, nor did the Weesners make a demand therefor. But in this regard it must be borne in mind that the Lake Central Majority Stockholders had already served notice on the defendant that they considered the Contract breached by defendant's filing for Route 88 under Section 401 of the Act.

In respect to the payment of the purchase price, the court finds that by reason of Paragraph 15 of the Contract, defendant was not obliged to pay for the stock until all of the approvals as provided for in Paragraph 7 of the Contract were obtained.

62. The evidence strongly favors the plaintiffs in respect to the materiality of the delays in Docket No. 5770. But for the postponements of the three scheduled hearing dates, it is reasonable to conclude that the Contract would have been performed or abrogated by the spring of 1954. This would have been within the time contemplated by the parties when the Contract was made. (Incidentally, it is apparent from the record before the C.A.B. that the parties were litigating in Docket No. 5770 the issue of defendant's breach of contract by the filing of its certificate application under Section 401 of the Act, and that they expected the issue to be resolved by the C.A.B. in the acquisition proceeding.)

It is relevant to the materiality of the delays to show the harmful consequences caused by the pendency of Docket No. 5770 and the inability to have the rights of the Lake Central Majority Stockholders finally determined.

Lake Central as a corporate entity was in critical financial circumstances and this was known by North Central. North Central's obligation to pay the purchase price of the stock was not absolute, but was conditional upon whether the C.A.B. approved the stock acquisition in Docket No. 5770. Therefore, throughout the pendency of Docket No. 5770 the entire risk of financial loss in Lake Central's business has been borne by Lake Central's stockholders. Had the hearings been held as scheduled, and not delayed by the defendant, the hazardous financial condition of Lake Central could have been greatly remedied. If the C.A.B., within the time contemplated by the parties, had approved the Contract, it could have been performed and the risk of loss shifted to North Central in the spring of 1954. If the C.A.B. had disapproved the Contract, the Lake Central Majority Stockholders could have eliminated the risk of loss by refinancing Lake Central. Lake Central has been prevented from obtaining necessary equity capital by reason of the pendency of Docket No. 5770 (Hartman's testimony—Transcript pp. 261, 377). Also, its financial condition steadily deteriorated subsequent to the delays.

Further in connection with the materiality of the three delays in Docket No. 5770, considering Lake Central's financial circumstance and its temporary certificate to fly Route No. 88, the court attaches considerable significance to one paragraph of the Contract. This is Paragraph 4, wherein it is provided:

"If the net book value of Lake Central Airlines, Inc. as of the cut off date and including the award in the initial permanent Mail Rate Settlement including losses arising out of a crash of a Beechcraft Bonanze airplane on August 21, 1952, plus $10,000 is negative at option of the Buyer, the Buyer may within 60 days perform, sell, assign, transfer or void this contract."

The import of this paragraph, as noted in the context of the materiality of North Central's breach in filing for Route 88, is

particularly appropriate on the issue of the materiality of its delays.

The flexibility of North Central's position under this provision was enhanced by postponement of C.A.B. action, when reference is made to the weakened condition of each of the airlines. As Lake Central's condition declined, North Central stood to escape the onus of the Contract. And meanwhile North Central gained time to prepare itself better to qualify, in the C.A.B.'s view, for the acquisition of Lake Central's stock.

Delay, therefore, in view of Lake Central's inability to refinance during the pendency of Docket No. 5770, becomes most material. This, coupled with the fact that defendant applied for Lake Central's route in violation of the Contract, adds even greater weight to the materiality of the delays. Defendant had nothing to lose and stood to gain by delaying, but the Majority Stockholders were subjected to a possible total loss under the Contract.

63. The delays caused by North Central in the stock acquisition proceedings before the C.A.B., as with its filing under Section 401 of the Act, contributed to the uncertainty already surrounding the likelihood of its future performance, not only because of the doubt they cast upon its willingness to carry through but because of the question they raised in regard to its ability to perform, as well, if the time for performance came before North Central was ready, able and willing to perform.

64. Based upon the foregoing findings and Findings No. 5 and 6, the court now finds that North Central committed a second material breach of the Contract by obtaining postponements of hearing dates in Docket No. 5770, thus delaying the proceedings and thereby preventing a decision by the C.A.B. in the acquisition case from being reached and the purchase price of the Lake Central stock from being paid within the time contemplated by the parties under the Contract.

65. The court further finds that the Lake Central Majority Stockholders did not acquiesce in the three delays brought about by North Central in Docket No. 5770 and that they by their subsequent conduct, did not waive the breach as committed by North Central in that respect.

66. Plaintiffs, in Docket No. 5770 before the C.A.B., acted timely in asserting the delays as a further ground upon which to predicate breach of contract, and such breach was not thereafter waived by them.

### Conclusions of Law

Based upon the foregoing findings of fact, the court concludes as a matter of law the following:

1. The court has jurisdiction of parties and the subject matter in this cause of action.

2. The law is with the plaintiffs and against the defendant.

3. Defendant breached the Contract of October 17, 1952, by making application for Lake Central's routes. Said breach is so substantial and material as to discharge the plaintiffs from further performance under the Contract.

4. Defendant breached the Contract of October 17, 1952, by applying for and obtaining three delays in scheduled hearings of the Lake Central Stock Acquisition Case, which prevented a decision by the C.A.B.—a condition to the parties' performance—from being made within the time contemplated by the parties, thus preventing the occurrence of either the payment of the purchase price or the termination of the Contract within the time contemplated by the parties.

5. Plaintiffs have not waived either of said breaches.

6. Defendant is not entitled to specific performance of the Contract even in the event the Civil Aeronautics Board approves its acquisition of the Lake Central stock and on performance by defendant of the contract conditions.

7. The plaintiffs are entitled to a declaratory judgment that they are dis-

charged from any obligation to perform under the Contract of October 17, 1952, and are entitled to recover the costs of this action.

Counsel for plaintiffs are directed to prepare and tender to the court a suitable judgment entry in conformity with the foregoing conclusions, whereupon the Clerk of the Court will enter the same.